WESLEY L. HOFFMAN v. THE CITY OF PORT HURON.

*Surveys—Boundaries—Location of highway—Evidence.*

| 102 | 417 |
| ,s 110 | 617 |
| 102 | 417 |
| f136 | 5265 |
| 102 | 417 |
| 145 | 210 |
| 102 | 417 |
| 150 | 2224 |

1. The reason for the rule that, as between the record of the survey of a highway, and a highway actually located upon the ground by fence lines, or by being graded and traveled or otherwise definitely fixed, the latter must prevail as the boundary of lands described as being so limited, does not exist unless the line of the road was actually located and definitely fixed, in which case the road itself becomes the controlling monument.

2. Streets that have been opened and acquiesced in by the parties interested, or by the public authorities, become permanent boundaries, and form new starting points for later surveys; citing *Twogood v. Hoyt*, 42 Mich. 609; *Van Den Brooks v. Correon*, 48 Id. 283; *Atwood v. Canrike*, 86 Id. 99, 103.

3. For the purpose of identification and certainty, resort may be had to a conveyance referred to in the instrument containing the uncertain description; citing *Daily v. Litchfield*, 10 Mich. 29; *Cronin v. Gore*, 38 Id. 381; *Fahey v. Marsh*, 40 Id. 236.

4. Where the description in a deed calls for land owned and occupied, the actual line of occupation is a material call to be considered in locating the boundaries.

5. Old fences have always been regarded as strong and trustworthy evidences in ascertaining and fixing boundaries; citing *Diehl v. Zanger*, 39 Mich. 601; *Twogood v. Hoyt*, 42 Id. 609;

102 MICH.—27.

*Wilmarth v. Woodcock,* 66 Id. 331; *Beaubien v. Kellogg,* 69 Id. 333.

6. Where two surveyors disagree materially as to the courses, quantity becomes a material consideration; citing *Winans v. Cheney,* 55 Cal. 567; *Hanson v. Township of Red Rock,* 57 N. W. Rep. 11.

7. A supposed boundary line, long acquiesced in, is better evidence of where the real line should be than a survey made after the original monuments have disappeared; citing *Stewart v. Carleton,* 31 Mich. 270; *Diehl v. Zanger,* 39 Id. 601.

Error to St. Clair. (Canfield, J.) Argued January 2, 1894. Decided November 7, 1894.

Ejectment. Plaintiff brings error. Reversed. The facts are stated in the opinion.

*A. R. Avery* and *H. W. Stevens (Avery Bros. & Walsh* and *Stevens & Merriam,* of counsel), for appellant.

*O'Brien 'J. Atkinson* and *Frank Whipple,* for defendant.

McGRATH, C. J. This is ejectment to recover the possession of a tract of land lying on the west shore of Lake Huron, in fractional section 26, town 7 N., of range 17 E., and known as "Fishery No. 1." Both parties derive title from a common source. The following diagram (a copy of that portion of the government survey) gives fractional section 26 and surroundings. (See diagram 1, page 419.)

The McNeil tract, referred to in the deeds hereinafter named, comprises private claims Nos. 244 and 357. In October, 1838, a plat was filed in the office of the register of deeds of St. Clair county, upon which the easterly portion of the McNeil tract, excepting the land between Lake street and the water, was laid out into lots and blocks. This plat shows a street along the lake shore, and eight other streets between Lake street and Fourth street, which

latter street bounds the plat on the west. The south line
of the plat was Michigan avenue, and twelve other streets
intervened between that avenue and Walnut street, which
was the northern boundary of the plat. The north-easterly
portion of this plat is inserted. (See next page.)

DIAGRAM 1.

DIAGRAM 2.

On October 14, 1841, John McNeil and others filed a petition in the circuit court for the county of St. Clair, alleging their proprietorship to all of the lands covered by the plat, and that no part had been sold except one lot upon the highway; and, further, that at that time all of the village north of Superior street was a wilderness, and not needed for village purposes, as it was then a forest; and asking that the streets and public places north of such Superior street might be vacated. Upon this application the court made an order vacating the plat; and upon December 30, 1841, a second plat was filed, showing

all the lands north of Superior street and east of Fourth street, laid out into what have since been known as "Outlots of the McNeil Tract."

DIAGRAM 3.

(A) On the 19th of July, 1840, Charles Butler conveyed to Robert T. Holland "part of fractional section 26, * * * bounded as follows: Commencing 50 links north, 36 degrees west, from a stake standing on the line of the 'McNeil Tract,' so called, and being the southeast corner of that part of said fractional section which lies west of the Lake road; and running thence north, 26 degrees west, along the west line of said road, 4 chains and 50 links, to a stake; thence south, 80 degrees west, 6 chains and 67 links, to a stake; thence south, 26 degrees east, 4 chains and 50 links, to a stake; thence north, 80

degrees east, 6 chains and 67 links, to a stake, being the place of beginning,—and containing three acres of land."

(B) On the 1st day of February, 1841, Charles Butler deeded to Joseph D. Beers "the south .part of fractional section 26, * * * lying west of the Lake road, excepting and reserving from the same three acres, heretofore sold to Robert T. Holland, off the south-east corner of said fractional section 26, lying on the west side of the said Lake road, and also reserving all of said section lying east of the said Lake road; said south part of said fractional section 26 containing, over and above the reservation herein mentioned, 50 acres of land." This deed conveys other lands, including parcels in the McNeil tract, and locates said pieces of land by reference to "a map of the subdivision of said McNeil tract."

(C) On the last-named date, Charles Butler deeded to William Bard, Thomas Suffern, and James McBride, "the following lots, in the village of Fort Gratiot, according to the field map, viz.: Lots 7 and 8 in block 55, lots 28 and 29 in block 60, also lots numbers 22 and 23 in block 19, the second last lot being the north-east corner of lot 21 of the McNeil tract, as subdivided; * * * also Fishery No. 1 on the lake shore, beginning at the north line of the Lighthouse Reserve on the lake, extending northerly 120 rods north of the north line of the 'McNeil Tract,' so called, including the land lying between the Lake road and the lake."

(D) On September 2, 1871, Beers, by executor, conveyed to John M. Hoffman "the south part of fractional section 26, * * * lying west of the Lake road (except three acres sold to Robert T. Holland), and containing 50 acres, be the same more or less."

(E) On June 3, 1873, Hoffman conveyed to Howe the last-named parcel, by like description.

(F) On June 9, 1873, Howe conveyed to Esther Dor-

wood a portion of fractional section 26, describing. the same as follows: " Commencing at a stake standing in the south part of fractional section 26, town 7 north, of range 17 east; running thence easterly, at right angles with the Lake Shore road; thence south, on a line parallel with the road, 10 rods; thence westerly, at right angles with the road, 8 rods; thence northerly, at right angles with the last line, 10 rods, to the place of beginning,— containing half an acre of land, said land *including the house now occupied by the party of the second part.*"

(G) On November 24, 1876, Howe reconveyed to Hoffman " the south part of fractional section 26,   *   *   * containing in all 53 acres, more or less, excepting three acres sold to Robert T. Holland, 2 acres to Mrs. Hall, one-half an acre to Mrs. Dorwood, and Fishery No. 1 on the lake shore."

(H) On February 6, 1877, Hoffman conveyed to the defendant " the south part of fractional section 26,   *   *   * excepting three acres owned by Holland, two acres owned by Mrs. Hall, and half an acre owned by Mrs. Dorwood, and Fishery No. 1."

The plaintiff derives his title to Fishery No. 1 by deed dated April 25, 1882, from Thomas Suffern, by executors, to Wesley L. Hoffman, which deed purports to convey the entire title; a deed dated February 3, 1875, from the administrators of the estate of William Bard to John M. Hoffman, conveying an undivided one-third of Fishery No. 1; a deed bearing date April 25, 1882, from John. M. Hoffman to Wesley L. Hoffman; and a deed dated September 16, 1882, from Robert T. Holland to Wesley L. Hoffman. These deeds of the Fishery contain a similar description to that above given in the deed from Butler to Bard and others (C).

Defendant insists that so much of Fishery No. 1 as was east of the premises conveyed has ceased to exist; that the

action of the waters of Lake Huron for a long series of years has had the effect to wear away the banks of the shore; that, at the point in question, it has so far encroached upon and worn away the land that the whole of that part of said fishery has been washed away, and that the place where it was is now covered by the waters of the lake, and that the water line now reaches to its lands. The plaintiff claims, on the contrary, that the fishery has not been washed away, but that it substantially remains; that the action of the water has not been such as materially to wear away the land; and that, though it may be worn away to some extent temporarily by storms, it generally makes on again to the beach, and, at least, a considerable part of the land constituting the fishery remains.

The disputed fact in the case is the location of the Lake road referred to in these several deeds. At a very early date, Robert T. Holland built a house upon the three acres conveyed to him by Butler (A), and inclosed said parcel by a fence. Many years ago, a street was opened on the line between fractional section No. 26 and the McNeil tract; and in 1876 Huron avenue was extended in a north-westerly direction beyond the north line of fractional section No. 26, connecting with the lake shore at a point north of said fractional section. The extension was called the "New Lake Road," and the old road was abandoned. The land conveyed as aforesaid to defendant was used by it for cemetery purposes. In 1883 a surveyor was employed by the cemetery board to locate the east line of said property. The surveyor was paid for his services by the cemetery board and plaintiff jointly. A survey was then made, the line fixed, and the cemetery authorities built a post and wire fence upon the line so fixed. The line as then fixed is the one for which plaintiff contends. In 1889 the cemetery authorities took down this fence, and constructed one to the water's edge. So

far as the record discloses, this was the first time that the defendant asserted the right to possession of any land east of the line of the fence so constructed as aforesaid.

No traces of any highway upon the surface of the disputed territory now remain. It appears that, for many years after the conveyances from Butler (A and B), there were trees and vegetation for some distance east of the Holland inclosure, and of the line fixed by the surveyor aforesaid; but violent storms have washed away the surface, and undermined many of the trees, so that much of the area between said fence line and the water's edge is a sandy beach, but the water's edge is still from 150 to 250 feet east of said fence line and east of the Holland inclosure. There was some evidence tending to show that the water's edge had been at times nearer to this line, and that, owing to the action of the cemetery authorities, the land had made on again; but it appears that, when the fence line was determined as aforesaid, there was land east of said line, and it does not appear that at any time the water line reached or passed such fence line. In the construction of the wire fence aforesaid, trees were made use of along the line to which to attach the wires.

Plaintiff introduced the township record of a highway along the shore, dated December 11, 1837, "surveyed by me, Nathan Ward, district surveyor, and Elijah Burch and Alexander Ashley, commissioners of highways." This survey gives courses, distances, and a large number of monuments. It commences on the north line of the township, and ends at "a post one chain from the west bank of Lake Huron," a point which is south of fractional section 26. The surveyor who located the fence line for the cemetery authorities in 1883 was called for plaintiff, and locates the starting point on the north line of the township, and admits his inability to find any of the intermediate monuments or finger posts except one, or to find the

"post one chain from the west bank," but claims to have followed the courses given in the highway survey aforesaid, and that such courses and distances brought him to the line of the road immediately in front of the fence inclosing the Holland tract, and upon the line of Lake street, as it appears upon the plats (2 and 3) above given. He found the stake upon the north line of the McNeil tract referred to in the deed (A) from Butler to Holland, and also the stake at the north-west corner of the Holland parcel, which is also referred to in that conveyance, and testifies that-the line of the road as retraced according to the survey made in 1837 conformed to these stakes. He also locates the Dorwood half acre as fronting on the line so traced by him. He further finds that the Holland inclosure does not contain quite three acres, and that, in order to give Holland the full three acres within his inclosure, it would be necessary to extend the north and south lines nearly a rod. His retracing gives to that part of fractional section 26 lying west of the line run by him 96.9 acres of land.

The defendant introduced a survey of the highway made in 1843, and a subsequent survey made in 1854. The courses and distances given, so far as section 26 is concerned, are substantially the same as are given in the survey made in 1837. The defendant called its city engineer, who testifies that, by following the courses and distances indicated in the several surveys, he came out at a point opposite the Holland inclosure, 40 rods east of the meander line. Upon cross-examination the witness says:

" Q. And, at a point of the boundary of section 15, your road of 1837 crosses the meander line, does it not?
" A. Yes, sir.
" Q. According to the government survey, it crosses the meander line into Lake Huron in section 15?
" A. Yes, sir.

" *Q.* And your line of 1837 crosses the meander line at that point into Lake Huron?

" *A.* Yes, sir.

" *Q.* And your survey of 1843 also crosses the meander line at the same point into Lake Huron, does it not?

" *A.* I will not say that it passes into Lake Huron; it passes the meander line.

" *Q.* The meander line indicates what there?

" *A.* It indicates a line somewhere near the border of Lake Huron.

" *Q.* The margin of Lake Huron?

" *A.* Not necessarily close.

" *Q.* Within what distance would you say it was?

" *A.* Probably within 3 or 4 rods; possibly more at points.

" *Q.* At that point it crosses what is here indicated as the meander line?

" *A.* Yes, sir.

" *Q.* And it joins the other road very closely down here, at section 26,—the two roads come together?

" *A.* They are said to come together.

" *Q.* Near the north part of fractional section 26?

" *A.* Yes, sir.

" *Q.* And the survey brings them up together at that point?

" *A.* They are said to.

" *Q.* And, from that where you cross that meander line, how much further did you survey that line of 1843?

" *A.* I surveyed it down to near the south line of 15.

" *Q.* Or a mile and a half above Holland's?

" *A.* Yes, sir.

" *Q.* Did you survey it any further?

" *A.* No, sir.

" *Q.* Then, from there down it is a joint line?

" *A.* From there it is a line completed from the notes.

" *Q.* From the time it crosses these two surveys, the one of 1837 and the one of 1843, they never get west of the meander line, do they, again?

" *A.* No, sir; not according to the way they plat.

" *Q.* And they never get within anywhere near it at the south end?

" *A.* No, sir.

" *Q.* Now, according to the field notes, they come out just about as they should on the plat; that is, they join just about as they should?

"*A*. They join just about as they should according to the notes.

"*Q*. That is just about as they should join?

"*A*. Yes, sir.

"*Q*. Now, as a matter of fact, Mr. Rogers, if this survey was ever run on that line as you run it, they must have run either in the water from the time they passed section 15, or else the meander line is not correctly laid down on that map, is not that so?

"*A*. That is true, I guess.

"*Q*. So that either, as a matter of fact, these two surveyors who surveyed these roads, the one in 1837 and the other in 1843, ran that road into the water from the time they passed section 15 down to the end, or else they have both made a mistake, or else the government has made a mistake?

"*A*. Yes; I think that can be answered in the affirmative.

"*Q*. Or else you have made one?

"*A*. Yes; put that in too, if you want to.

"*Q*. Now, the two must have made practically the same mistake, must they not,—substantially the same mistake?

"*A*. It seems to me, the way their notes plat.  *   *   *

"*Q*. Now, at this point, I don't remember how many rods you said you were out there in the lake.

"*A*. I said over 40 rods.

"*Q*. How many chains would that be?

"*A*. 10 chains.

"*Q*. Beyond the meander line?

"*A*. Yes, sir.

"*Q*. So that, if the road was ever run out into the lake at that point, that meander line was set 10 chains west of the road?

"*A*. If the road was ever there, the meander line was 10 chains west.  *   *   *

"*Q*. Why do you estimate, Mr. Rogers, that there was ever any land out there, beyond the meander line, upon which to run a road?

"*A*. I never said there was, that I know of.

"*Q*. You made a map in which you located a road out there?

"*A*. I didn't locate a road. I located some minutes of a survey that was placed in my hands.  *   *   *

"*Q*. At that point, then, you knew the fact that the center of the road, what was called the 'Lake Road'

there, was at that point when you made the survey up
here in section 4?

" A. I knew about it according to that plat.

" Q. Then, if that plat was correct, you had two definite
points of certainty when you made the survey?

" A. Not in those minutes. It doesn't say anything
about that. It simply gives courses and distances from
one point.

" Q. If that Lake road was correct on the plat at that
point—

" A. If it was?

" Q. If it was correct at that point, and this quarter
post up at that point was correct, you had two points of
certainty, had you not?

" A. Yes; if that was correct.

" Q. So that you knew, when you were surveying here,
when you crossed this line and ran out into the lake, you
knew that you were there out of the way, that you were
making a mistake, or. somebody else had made a mistake,
did you not?

" A. Certainly, I did."

The defendant supplemented this testimony by that of
a number of witnesses, none of whom had resided upon
the road, or at or near the land in question, but who had
occasionally, at intervals between 1836 and 1860, traveled
along this shore. The testimony of these witnesses, how-
ever, does not tend to show any authoritative location of
a highway, nor does it ' tend to locate any particular or
definite way by user. The witnesses disagree as to the
distance from the Holland house to the fence, as to the
distance from the fence to the road, and from the road to
the water. No other definite monument is referred to. A
majority of them fix the distance from the house to the
fence at from 5 to 6 rods. Certain of them insist that
the road was near the fence, and two of them state that
the Holland fence was the west boundary of the highway;
others state that it was from 25 to 30 feet from the fence;
and others vary the distance from 4 to 10 rods. The
distance from the road to the water is given by some at

4 rods, by others at 6, by others at 8, again at 10, and by some as high as 20 to 25 rods. All agree that there was no road cut out, having any definite or uniform width, and that travelers drove anywhere between the road and the lake. One witness says:

"There were quite a number of tracks parallel with each other every two or three rods. Have seen as many as half a dozen parallel tracks. Everybody made a road for themselves."

Another says:

"There were numerous traveled tracks."

Another:

"There were half a dozen roads. When it got packed with heavy sand, we would shift again, and so on."

Another says:

"Some places the roads were 3 rods apart; some places, not over 2 rods. Farmers jogged in, I suppose, to get the best road."

Another says:

"There was no cut-out road, except cut out to take a sled through. They took out a few trees to let a sled through, and kept as close to the water as they could, so as to have as slight a cut as they could. It was what you would call a 'bush road.'"

Another says:

"It was never more than a mere wagon track through the timber. There were no regular dimensions, or anything like that."

Another says:

"It was supposed to be a road, but they run anywhere between the road and the beach. In very dry weather they would go just as close to the water as they could get,—right on the border of the lake. The road as traveled wasn't straight; it zigzagged around."

Several of these witnesses say they "think," or that

they "should say," or that their "judgment is," that
Holland's fence had been moved, or that it must have
been moved, to the west.  No witness testifies to the fact
of removal, but they judge from alleged changed appear-
ances at times years apart.  Ransom Holland, whose father
lived in the house upon this inclosure from about the
time of the purchase of the three-acre tract until 1886,
and who himself has lived upon the tract since his birth,
in 1841, testifies that the fence is now where it has always
been.  A number of these witnesses give the course of the
road in the vicinity of the Holland tract as north-easterly,
but the government meanders make fractional sections 26,
23, 22, 15, 10, 9, and 4.  Section 23 contains less than 12
acres.  The north line of 22 is less than 54 chains, and
the north line of 15 is 22 chains, and the course of the
meander line is nearly direct from the south line of 26 to
the starting point in 4.

The survey commences on the north line of the town-
ship, and locates its southern terminus at a point south of
the land in question.  There was no east and west road at
such terminus, and the presumption is that it closed with an
existing highway.  This survey was made in December,
1837, and the plat (diagram 2) showing the course of the
highway from the north line of the McNeil tract southerly,
beyond the terminus of the recorded survey, to the Light-
house Reserve, was recorded in October, 1838.

As between the record of a highway, being a survey
thereof by the proper authorities, or a dedication thereof
to the public, and such a use of the margin along the
shore of the lake, which margin is from 10 to 30 rods in
width, as is indicated by the testimony of the defendant's
witnesses, which use includes the use of the way described
in the survey or defined in the plat, the former must pre-
vail, because the most certain.  There is no room in the
present case for the application of the rule that, as between

the record of the survey of a highway, and a highway actually located upon the ground by fence lines, or by being graded and traveled or otherwise definitely fixed, the latter must prevail, and the presumption must be in such case that the description in the deed, bounding the land by such highway, referred to the highway as it actually existed upon the ground at the time of the conveyance. The reason for that rule does not exist unless the line of the road was actually located and definitely fixed, in which case the road itself becomes the controlling monument. Streets that have been opened and acquiesced in by the parties interested, or by the public authorities, become permanent boundaries, and form new starting points for later surveys. *Twogood v. Hoyt,* 42 Mich. 609; *Van Den Brooks v. Correon,* 48 Id. 283. In *Atwood v. Canrike,* 86 Id. 99, 103, it is said that—

"Without proof that the line of the road, as shown by the record, had been opened or used at the time the deed was made, or proof that no road called a 'State road' had been opened or used, * * * the record would not be material."

In the present case there is no proof that, at the time when Butler conveyed these parcels of land, a highway had been cut out or graded or worked or its location definitely fixed by authoritative action, and, as respects use or travel, the testimony clearly tends to show that the use was not confined to any line within a strip of land from 10 to 30 rods in width. Testimony of that character is admissible only as a *dernier* resort. *Kilgannon v. Jenkinson,* 57 Mich. 325. See; also, *Lyle v. Lesia,* 64 Mich. 16.

The Holland tract is described in the deed from Butler to Holland (A) by metes and bounds, the courses and distances are given, and four stakes are expressly referred to. The deed from Butler to Beers (B) excepts three acres, "heretofore sold to Holland, off the south-east corner of

said fractional section 26, lying west of the Lake road."
The Dorwood tract is described in the deed from Howe to
Dorwood (F) by metes and bounds, courses and distances.
These deeds refer not alone to the Lake road as a bound-
ary, but to these parcels as located on such Lake road,.
and stakes on the highway are frequently referred to as
monuments. The Holland parcel is referred to as occupy-
ing the south-east corner of the tract included in the
general description. As is said in *Willey v. Snyder,* 34
Mich. 60, written descriptions of property are to be inter-
preted in the light of the facts known to and in the
minds of the parties at the time.

" Descriptions do not identify of themselves; they only
furnish the means of identification. They give us certain
marks or characteristics,—perhaps historical. *data* or inci-
dents,—by the aid of which we may single out the thing
intended from all others; not by the description alone, but
by that explained and applied. Even lands are not identi-
fied by description until we place ourselves in the posi-
tion of the parties by whom the description has been
prepared, and read it with the knowledge of the subject-
matter which they had at the time."

The conveyances through which defendant derives its
title furnish the means of identification. The boundaries
of neither of these excepted tracts are defined in the
deeds in which the exceptions are made. Resort to the
deeds conveying the excepted parcels is absolutely essen-
tial. It is well settled that, for the purposes of identifica-
tion and certainty, resort may be had to a conveyance
referred to in the. instrument containing the uncertain
description. *Daily v. Litchfield,* 10 Mich. 29; *Cronin v.
Gore,* 38 Id. 381; *Fahey v. Marsh,* 40 Id. 236; *McAfee v.
Arline,* 83 Ga. 645; *Weeks v. Martin,* 10 N. Y. Sup. 656;
*Cannon v. Emmans,* 44 Minn. 294.

The deed to Dorwood (F) expressly referred to the land
102 MICH.—28.

as occupied by the grantee, and it was held in *Fahey v. Marsh* and *Cronin v. Gore* that, where the description in a deed calls for land "owned and occupied," the actual line of occupation is a material call to be considered in locating the boundaries. Neither Holland nor Mrs. Dorwood could be heard to say that the conveyances to them embraced land east of the monuments referred to in their deeds. The highway to which their grantors referred was made manifest and certain by monuments, courses, and distances given in the conveyances. The result of defendant's contention would be to permit it to take lands lying between the highway defined in the Holland and Dorwood deeds and the highway sought to be established, and to cut off both tracts from the highway.

The surveyor who fixed the line in 1883 found two of the stakes referred to in the deed from Butler to Holland (A),—one of them at the south-east, and the other at the north-west, corner of that tract. In addition, the surveyor testified that Holland's fence took substantially the course named in the deed (A), and that it made allowance for a highway along the east line of the inclosure. Old fences have always been regarded as strong and trustworthy evidences in ascertaining and fixing boundaries. *Diehl v. Zanger*, 39 Mich. 601; *Twogood v. Hoyt*, 42 Id. 609; *Wilmarth v. Woodcock*, 66 Id. 331; *Beaubien v. Kellogg*, 69 Id. 333. It was also shown that the area in the Holland inclosure was within one-tenth of an acre of the quantity named in the Holland deed (A), and that the line contended for by plaintiff gave to that part of the fractional section substantially the quantity of land named in the conveyances thereof. In February, 1841, Butler conveyed to John McNeil "the north fractional part of section 26, * * * containing 44 acres of land, reserving the land between the road and the lake for fishing." The deed

from Butler to Beers gives the quantity thereby conveyed at 50 acres, and the quantity conveyed to Holland is stated at three acres, making the total acreage given in that part of the section lying west of the road 97 acres. Paldi, who made the survey for the cemetery board, and whom plaintiff called, computes the acreage west of the line fixed by him at 96.9 acres. The starting point of the surveyed highway is found. The post at the southern terminus is lost. All the intermediate finger posts, except "a rill," are gone. Two surveyors disagree materially as to the courses. In such case, quantity becomes a material consideration. *Winans v. Cheney*, 55 Cal. 567; *Hanson v. Township of Red Rock*, 57 N. W. Rep. 11.

Again, the recorded maps or plats (2 and 3) show a street or roadway to the east of the lots, and a margin between the street and the lake, extending from the north line of the McNeil tract southerly to the Lighthouse Reserve, which street is a continuation of the way indicated by description in the Holland deed (A). The survey of the highway was made in December, 1837. Plat 2 was recorded in October, 1838. Plat 3 was recorded in December, 1841, and locates the street on the same lines as does the second plat. The deed to Holland (A) is dated July 19, 1840. The deed from Butler to Beers (B) and the deed from Butler to Bard and others (C) are dated in February, 1841. The deed from Howe to Mrs. Dorwood (F) is dated June 9, 1873. The deed from Hoffman to defendant is dated February 6, 1877. What constituted Fishery No. 1, excepted in the last-named conveyance, is made certain by reference to other conveyances. The highway survey antedates the plats; the first plat antedates the deed to Holland; and both plats antedate the deeds of the parcels the boundary line between which is in dispute, as both deeds in terms refer to the second plat. These facts respecting the plats and the determination of the boundary

lines of the Holland and Dorwood tracts were not disputed, and the jury should have been instructed that the description in the deeds referred to a highway so located, and that they would not be justified in finding that reference was intended to a highway from 50 to 70 rods east of that line so fixed, or to any other highway than that specifically indicated. There is no evidence in this record tending to show that, when the conveyances A, B, and C were made, there was any other road actually located upon the ground or cut out, or to which travel was confined, or that had such a character as a highway that it might be treated or adopted as a boundary line, and held to control a recorded survey or plat. Much less could a shifting way be allowed to control a boundary line definitely fixed by monuments referred to in the conveyances. Nor do we think that the use of said highway subsequent to that time, including, as it did, travel up to the line fixed, was such as to locate definitely any other highway line which can be held to control the recorded highway survey. If it be true that, in the resurveys alleged to have been authoritatively made in 1843 and 1854, the line through section 26 was not changed, that fact would negative any intention on the part of the authorities to recognize any change in the course or location of the road; and the further fact that as late as 1873, at the time of the conveyance to Esther Dorwood, the line as then fixed conformed to that referred to when A, B, and C were made, would indicate clearly that there was no recognized change in the location of the highway.

Respecting the line of the highway north of the Dorwood tract, the parties must be held to have referred to a highway which was a continuation of the highway as defined south of that point. In view of the existence of the survey when the conveyance to Holland was made, the short time that elapsed between the date of the survey

and that conveyance, the plats locating the *situs* of the highway, and the fact that no road had been actually cut out or otherwise definitely located upon the ground, it must, we think, be presumed that the road referred to was the surveyed road, and that the line of said road as indicated by the plats and stakes was the surveyed line, as understood by the parties to the conveyances in which the road is referred to as a boundary. That line was fixed at a time when no dispute had arisen. Up to the time of the conveyance to Mrs. Dorwood, and up to the time that the fence was erected, in 1883, the line thus indicated seems to have been unquestioned. Although the travel had been of a fugitive character during the entire period, and resurveys had been made by the authorities, yet no change had been made in the survey of the line in question. While these circumstances may not, as a matter of law, be conclusive as to the correctness of the location of the line of the highway, yet they are trustworthy evidences to be considered by the jury, and tend to corroborate Paldi's resurvey.

Mr. Rogers, in his survey, seems to have started out with the assumption that the magnetic declination named in the survey of 1837 was the correct one; and although it carried him across the meander line, and out into the lake, at a point nearly three miles north of the southern terminus of the survey, and kept him there until, when he reached 26, he was 40 rods east of the meander line, and from 50 to 70 rods east of the line fixed, by description and plat and stakes, at or shortly after the time that the survey was made, and although the plats extended such highway beyond the southern terminus of the surveyed highway, he made no effort to reconsider the assumption with which he started out, or to harmonize his resurvey with conditions which seem to have existed for over 50 years. As contended for by plaintiff, we think

that the presumption is that the highway as surveyed was within the government meander lines. In any event, the boundary line as indicated by the courses given in the Holland deed, the stakes referred to in that deed and in the Dorwood deed, the fences inclosing the Holland and Dorwood tracts, and the line of the highway as fixed by the plats, is the boundary that must control, and this upon the principle that a supposed boundary line, long acquiesced in, is better evidence of where the real line should be than a survey made after the original monuments have disappeared. *Stewart v. Carleton,* 31 Mich. 270; *Diehl v. Zanger,* 39 Id. 601.

With reference to the line north of the Dorwood tract, as already intimated, the parties must be held to have referred to a highway which was a continuation of the highway as defined south of that point; and the location of the lines extended must be determined by following from that point, northerly, the courses given in the recorded survey within the limits of the section.

Plaintiff also made the claim of title by adverse possession, and complains of the instruction that if Holland's possession was not in hostility to, but in recognition of, Suffern's title, and he held under Suffern, as a tenant or by his permission, then such possession would not be a sufficient one upon which to found an independent title. This instruction was erroneous. Defendant does not claim through Suffern. Holland's possession, as tenant of Suffern, was the possession of the latter; and plaintiff, having acquired that title, could tack possession under it.[1]

The judgment must be reversed, and a new trial ordered.

The other Justices concurred.

---

[1] Suffern was claimed to be the survivor of the grantees named in the deed C, which created an estate in joint tenancy.