CONNER v. DETROIT TERMINAL RAILROAD CO.

1. ADVERSE POSSESSION — QUIETING TITLE — CONTINUITY — BOUNDARIES.

   Where complainant and defendant were the owners of parcels of land and a strip about 35 feet wide lying between the two parcels was occupied by the defendant under a claim of adverse possession, based upon an ancient fence which had fallen into decay, and of which only the posts remained during the latter part of the alleged statutory period, the evidence also showing that a portion of the fence had not been continuously maintained on a large

183 Mich.—16.

part of the line at the south end of the parcel in dispute, the trial court erred in finding and adjudging that the defendant had secured any rights by adverse possession.

2. SAME—EVIDENCE—BURDEN OF PROOF.

It is elementary that the burden of proving adverse possession rests upon the party who alleges it: strict construction of the doctrine is applied; possession must rest upon clear and positive proof, not inference.

3. SAME.

As a general rule the law will not presume that possession separate from the title to real property is of an adverse character and every presumption favors the construction that it was in subordination to the title of the true owner; there must be proof that the possession was actual, continued, notorious, distinct, and hostile.

Appeal from Wayne; Murphy, J. Submitted October 13, 1914. (Docket No. 83.) Decided December 18, 1914. Rehearing denied April 28, 1915.

Bill by William J. Conner, trustee under the will of R. H. Conner, deceased, against Detroit Terminal Railroad Company, et al., to quiet title to real property. From a decree for the defendants complainant appeals. Reversed.

*Arthur Jones* (*Fred A. Baker*, of counsel), for complainant.

*Angell, Bodman & Turner*, for defendants.

BROOKE, J. The bill of complaint in this cause is filed for the purpose of quieting the title to a strip of ground running from Conner's creek to the Detroit river. At its northerly or Conner's creek end it is some 18 or 20 feet wide. At its southerly or Detroit river end, it is about 35 feet wide. Private claims 386 and 392 lie side by side; 392 lying immediately west of 386. The strip of land in question is off the westerly side of private claim 386, immediately east of the

line between the two private claims. The record discloses that between Jefferson avenue and Conner's creek a fence was built many years ago. This fence ran southerly from Jefferson avenue, but did not run the entire distance down to Conner's creek. It was not built upon a true line between the two private claims, but upon a line a few feet east of the true line, which diverged slightly to the east as it ran south. On the south side of Conner's creek also, at an early date, there appears to have been constructed a post and wire fence on this same line produced. Between Conner's creek and the river the land is very marshy, being covered with water, for the most part, at some seasons of the year. The boundary line between the two claims north of Conner's creek is not in dispute. While there is abundance of evidence in the record that a fence was constructed south of the creek upon the same line as that which ran north of the creek to Jefferson avenue, the record discloses that the fence never ran to the extreme southerly portion of the claim, nor was it constantly maintained. In the year 1906 one Herbert L. Russell, a civil engineer, was instructed to go upon the property, in behalf of the owners of private claim 392, and determine the easterly line of that property. With reference to the fence south of Conner's creek, he testified:

"In that portion there were evidences of the old fence, the posts of which were standing, and quite a good many of the strands of wire were there, although it was not a complete fence, but it was in very fair line."

No attempt was made in 1906 to reconstruct said fence, but in 1913 the defendants undertook to build a new fence upon the line occupied by the old one. It is undisputed that this line is, as before stated, some 18 or 20 feet east of the true line at its north end, and about 35 feet east of the true line at its south end,

and between this fence and the true line lies the property in dispute.

When the complainants learned of the attempt on the part of defendants to erect a new fence upon the line occupied at an earlier date by the old one, he filed his bill of complaint. He showed his title to that part of lot 386 which would include the strip in question, and asked a decree quieting the title in him. The defendants claimed title to the strip in question by adverse possession. It is not contended on behalf of the defendants that their (paper) title covers anything east of the east line of private claim 392, but they aver, by the existence of the old fence, the line between private claims 386 and 392 has been established by consent of the early owners and their successors in title, and that acquiescence in said line has existed for a period much in excess of the requisite statutory time. I have pointed out the condition of this fence, as disclosed by the testimony of Mr. Russell, in the year 1906. At that time it had been allowed to fall into entire decay and the line of its location could only be determined from occasional posts and a few strands of wire which still remained. By 1913, when defendants undertook to construct the new fence, Mr. Russell testifies that there were evidences of the same old fence south of Conner's creek, but at that time it seems practically to have disappeared.

A witness, John Pische, Jr., called on behalf of the defendants, after giving testimony as to a part of the distance south from Jefferson avenue to Conner's creek, testified as follows:

"*Q.* There was also a fence south from the creek in an early day?
"*A.* Towards the river?
"*Q.* Yes.
"*A.* Not in my days.
"*Q.* You didn't know that fence?

"*A.* Not from the creek south; there was a fence there in later years, but not really early days.

"*Q.* Did the fence ever extend from Conner's creek in the present channel to the Detroit river?

"*A.* There was no fence in there  only these later years.

"*Q.* Was there ever a fence more than a third of the way from Conner's creek down to the river?

"*A.* I would say that would be less than a third, or about a third."

On redirect examination this witness testified:

"It is only a few years ago that I noticed that fence. On P. C. 392 and the claims west they pastured cattle before it was platted for the past 15 years."

Mr. Robert Trombley, an old resident, gave testimony on behalf of defendants, but an examination of his testimony with reference to the fence in question and the occupation of the land on either side of the fence seems to limit its applicability to that portion lying north of Conner's creek.

The most important testimony given on behalf of defendants with reference to the existence of the fence in question, and of the character of the occupation of the land on either side thereof, was given by Messrs. Houghten and French, ice dealers, who had leases of ice privileges upon land both on 386 and 392.

Mr. Houghten's testimony is, in part, as follows:

"*Q.* At the time you went on the land in 1891 or 1892, will you tell the court whether there was any fence along the east dyke side on the property which you leased from Mr. Seitz?

"*A.* Yes, sir; there was a fence from the channel bank or from the dyke, rather, to Conner's creek.  I don't think it was a new fence.

"*Q.* At the time you took possession were you given to understand that your right under the lease stopped at that fence?

"*A.* Yes.

"*Q.* Who occupied or owned the land on the easterly side of that fence?

"*A.* Mr. Conner.

"*By the Court:* That fence of which you speak was north of Conner's creek?

"*A.* South of Conner's creek.

"*By Judge Angell:* From Conner's creek to the river?

"*A.* (by witness). From Conner's creek to the dyke, which is close to the channel bank.

"*By Judge Angell:* And Mr. Conner had the property east of that fence?

"*A.* Yes, sir. I had the ice rights or privileges to the Conner property and the privilege to put a dredge cut in there, and occupied under that arrangement until quite recently, and have executed leases with the Conner heirs or trustees..

"*Q.* The dividing line, as you understand it, in 1891, between the two properties you leased was this fence you speak of?

"*A.* As far as we knew anything about it; that is what Mr. Seitz gave me to understand was our line when we leased the property. When we cut ice we had not to look for a line, we could go on both pieces of property.

"*By Mr. Jones:* I move to strike out what Mr. Seitz said or what information he received from Mr. Seitz as incompetent.

"*By the Court:* I wish Mr. Houghten would describe that fence here which he speaks of, south of the creek up to the dyke.

"*Witness:* It was a fence of cedar posts, I think, 8 feet apart, as near as I can remember; three boards on it, and two, three, or four strands of wire—three or four strands of barbed wire.

"*By the Court:* What would you say approximately its length was?

"*A.* From the bank to Conner's creek, I never measured it, but I should think offhand, it was 1,200 or 1,500 feet. (Witness continuing): I think our lease of the so-called Seitz property was four or five years. There were some parts of the fence there in 1891. There were some traces of it there. The last I can remember of it there was some posts there and some wire there. I think the boards were all gone. It was there when I took the property, and there was some of it there when we gave up the property. It

has been allowed to get out of repair during the period we were there.

"*Q.* About how far back from the water of the Detroit river, at ordinary stages, was this dyke you speak of?

"*A.* Sometimes more than others. Sometimes the water was up, within 20 feet of it and sometimes 50 or 75 feet."

Cross-examination by counsel for complainant:

"I think we leased from Mr. Richard H. Conner the following year after we leased the Seitz property. It was in 1893. It was a five-year lease, and expired about 1898, and it was renewed for five years more. The lease was practically the same; I don't think it was changed. That expired in 1903, and when it expired we made another new lease with Richard H. Conner for five years more, and then we made a lease with the trustees of the estate which contains practically the same description as in the lease from Richard H. Conner. I think the description is the same. While that lease was pending the Houghten-French Company sold out to the General Ice Delivery Company, which now has a lease or understanding for the use of the property. (Witness, shown the lease from the trustees of the Richard H. Conner estate to the General Ice Delivery Company, says that the description is the same as in the leases that Houghten-French Company had.) We had the ice privileges on the Seitz property and all of the property up to the east line of lot 6, which belonged to Mr. Conner. The only time we paid any attention to the lines was when we had to dig a canal to get in on the east side of the Seitz property.

"*Q.* And that is the only time you paid any attention to the line?

"*A.* That is the only time I looked for the line.

"*Q.* You dug that canal from the fence east?

"*A.* No; I think we went east of the fence, if I remember right. We dug that canal partly on the Seitz property and partly on the Conner property; I think we took our chances on that."

Mr. French's testimony upon the same point follows:

"I live in Detroit, and have since 1871, and was a member of the Houghten-French Company, and was in the ice business for a great many years.

"*Q.* Did you and Mr. Houghten take a lease from John Seitz of the frontage part of claim 392 years ago?

"*A.* Yes, sir.

"*Q.* And later did you and he take a lease from Mr. Richard Conner of some property lying next east of it?

"*A.* Yes, sir; I went out of the business five years ago the coming spring, and at that time the leases were still in force, and we were operating there in the ice business. I worked for Mr. John Seitz two or three years prior to the time we made this lease with him, working in the ice business, peddling ice, and cutting and storing it. I have known this property for a good many years.

"*Q.* When Mr. Houghten took the lease from Mr. Seitz about 1891 or 1892, what can you tell us as to whether there was any fence along on the marsh running back from the river east of his land?

"*A.* Yes; there was.

"*Q.* Where was the fence located?

"*A.* On the east line. I was told that it was the east line between the marsh; between the old Conner's creek and the river bank, the channel or the old cut that was there.

"*By Mr. Jones:* I move to strike out the testimony of what he was told and what was supposed.

"*A.* I understood it to be our line.

"*By Judge Angell:* Is that what Seitz told you?

"*A.* Yes, sir.

"*By Mr. Jones:* I object to that.

"The fence at that time was in pretty fair shape. It was a little wire fence, short cedar posts sharpened up nicely and put in there and wire strung. After we made our lease arrangements, we cut hay on the marsh every year if it was not too wet to get in there and cut it. The fence got out of repair. Nobody paid any attention to it; and it was gradually taken away more or less. The posts stood there, more or less; a post stood there. It was not in our way when we cut hay any more than to pick up the wires with the mowing machine. The fence was put in there after

Mr. Seitz bought the property from Mr. Warren.  I didn't help put that in.   I helped build some north of Jefferson avenue, but I didn't have any hand in that, but I know it was put there about 1874 or 1875, I think."

Thereupon the following statement was made by the counsel for the complainant:

"*By Mr. Jones:*  I am willing, if your honor please, on behalf of the complainant, to state that the complainant does not deny, and never has denied, that at one time a fence was existing from Jefferson avenue south about half way to Conner's creek, as the channel now runs, and from the south line of Conner's creek a major part of the distance to the Detroit river; that that fence existed a number of years prior to the death of Mr. Richard H. Conner, and in a broken-down fashion at the time of his death.  I am willing this statement should go upon the record as an admission from the complainant, or as a statement of fact.  Had Mr. William J. Conner been cross-examined upon that point, he would have so testified."

We have quoted this testimony rather at large for the purpose of showing the character of the proofs upon which defendants must rely in order to establish title to the disputed strip by adverse possession.

It is elementary that the burden of proving adverse possession rests upon the party alleging it.  The doctrine is to be construed strictly, and such possession cannot be made out by inference, but only by clear and positive proof.  1 Am. & Eng. Enc. Law (2d Ed.), p. 887.

As a general rule, where the possession of land is separated from the title, the law will not presume that the possession is adverse, but every presumption is in favor of possession in subordination to the title of the true owner.  1 Am. & Eng. Enc. Law (2d Ed.), p. 888. See, also, cases cited on page 541 in *Yelverton* v. *Steele,* 40 Mich. 538.  In this case it is said, quoting from Mr. Justice Duncan from a note to *Taylor* v.

*Horde,* 2 Smith's Leading Cases, 561, that in order to constitute a bar to the assertion of a legal title by the owner of it, adverse possession must be "an actual, continued, visible, notorious, distinct, and hostile possession."

While not controlling, the following facts are significant: The deed from Seitz and wife to Joseph H. Berry of private claim 392 does not purport to convey any portion of private claim 386, upon which the disputed strip lies. On the 15th of February, 1906, Mr. Joseph H. Berry deeded to the Detroit Terminal Railroad Company a strip of property for its right of way, described as follows:

"All that certain piece or parcel of land situate and being in the village of Fairview, county of Wayne, and State of Michigan, and described as follows, to wit: A strip of land 66 feet in width from the easterly side of private claim 392, being the east 66 feet of the said private claim, the said strip extending from Jefferson avenue southerly to the harbor line of the Detroit river, and containing 8 acres of land, more or less."

The railroad, grantee in said deed, built upon the 66 feet lying west of the true line between the two private claims. No part of the strip in dispute was occupied by said railroad company as its right of way under said deed.

From these facts it is argued by counsel for complainant that neither Mr. Berry nor his grantee, the railway company, regarded the old fence line as the true dividing line between the claims in question. The cases of *Diehl* v. *Zanger,* 39 Mich. 601, *Hoffman* v. *City of Port Huron,* 102 Mich. 417 (60 N. W. 831), *Husted* v. *Willoughby,* 117 Mich. 56 (75 N. W. 279), *F. H. Wolf Brick Co.* v. *Lonyo,* 132 Mich. 162 (93 N. W. 251), and *Gildea* v. *Warren,* 173 Mich. 28 (138 N. W. 232), relied upon by defendants, and accepted as controlling by the learned circuit judge, seem to us

to be clearly distinguishable from the case at bar. In the instant case the fence relied upon as fixing a boundary line by the acquiescence between adjoining landowners never extended the entire distance upon the line claimed by the defendants, and it was not maintained continuously. The character of the land upon their side of the fence should be taken into consideration. It was such as to render actual husbandry impossible, and, probably, even pasturage of little value.

Under the proofs contained in this record, we are of the opinion that it would be carrying the doctrine of adverse possession to a point farther than it ever has attained in this State to hold that this old fence, erected many years ago through a marsh, and which was thereafter allowed to fall into decay and disuse, was sufficient to establish a boundary line between the two private claims, and thereby dispossess complainant of real estate to which he has the legal title.

The decree of the circuit court will be reversed, and a decree will be entered in this court in accordance with the prayer of the bill.

McAlvay, C. J., and Kuhn, Stone, Ostrander, Bird, Moore, and Steere, JJ., concurred.