## MENDEL v. POLAND.

1. ADVERSE POSSESSION—HIGHWAYS AND STREETS—EVIDENCE—
   SUFFICIENCY—INJUNCTION.

   In an action to restrain a township highway commissioner
   from removing certain fences enclosing part of the high-
   way claimed to be owned by plaintiff by adverse posses-
   sion, evidence *held*, insufficient to establish title by ad-
   verse possession.

2. SAME—PUBLIC LANDS—STATUTE.

   It is no longer possible in Michigan to obtain title by ad-
   verse possession against the public. Act No. 46, Pub. Acts
   1907 (3 Comp. Laws 1915, § 12311).

3. SAME—HIGHWAYS AND STREETS—SUFFICIENCY OF PROOF—NOTICE.

   Where one seeks to obtain lands against the public by ad-
   verse possession of a part of a highway or street, the
   possession should be of such character, and under such
   circumstances, as to warrant the conclusion that the mu-
   nicipal authorities must be held chargeable with notice of
   the adverse possession and with acquiescence therein; and
   in order that the occupancy may ripen into a title it is
   necessary that all the elements be clearly established, that
   is, the possession must be actual, continuous, visible, no-
   torious, distinct and hostile to that of the public.

4. SAME—HIGHWAYS AND STREETS—PERMISSIVE USER.

   Where the original owner of the land testified that he in-
   tended to give two rods as his share of the highway, and
   he thought he placed the fence upon the proper line, and
   no claim was made by him or his successors in title to
   any property belonging to the highway, which the fences
   enclosed, plaintiff and her predecessors had only a per-
   missive occupancy of the highway occupied by them,
   which ceased when the public, through its proper officers,
   demanded the use of the entire highway.

Appeal from Muskegon; Sullivan, J. Submitted
January 17, 1918. (Docket No. 109.) Decided March
27, 1918.

Bill by Mary Mendel against Charles Poland, high-

way commissioner of Norton township, to enjoin the removal of certain fences. From a decree for plaintiff, defendant appeals. Reversed, and bill dismissed.

*R. J. MacDonald* (*William H. Simpson,* of counsel), for plaintiff.

*Carpenter & Jackson,* for defendant.

KUHN, J. The plaintiff is the owner and occupant of the southeast quarter of the northeast quarter of section 19, in the township of Norton in Muskegon county. A public highway, surveyed and laid out with a width of 66 feet, runs along the north side of plaintiff's farm on the eighth line of the section, and another along the east side of her property on the section line. In the year 1915 plaintiff tore down the old, dilapidated fencing along the north and east sides of her farm and constructed strong and substantial fences on both of said sides. The one on the north side, according to the testimony of the township officials, encroaches about seven feet, and the one on the east side about eleven feet, upon the highways respectively adjoining.

On September 12, 1916, the defendant, who is the commissioner of highways for the township of Norton, made two orders requiring the plaintiff to remove, within 30 days, the said encroaching fences. On November 8, 1916, plaintiff filed a bill to enjoin the defendant from forcibly removing these fences, alleging as the ground for her bill that the land enclosed thereby, which is claimed to be a part of the highway,

"Is the property of this plaintiff by adverse possession, she being the owner thereof and the right of her fences established upwards of 40 years ago, and her right and title have ripened by adverse possession into absolute title thereto and cannot be disturbed by the said highway commissioner by his threatened action, and her right to continue fences on said highways at

the places aforesaid has become fixed and established so far as this threatened action of the defendant is concerned."

Upon the filing of her bill a temporary injunction was issued restraining defendant from tearing down, destroying or removing said fences, and after a full hearing of the case the circuit judge entered a decree in favor of plaintiff, making the injunction permanent.

The testimony showed that one Ezra E. Tyler, a former owner, was the man who cleared the farm and built the first fences; that he gave two rods off the north of the farm for highway purposes; that the surveyor who surveyed the road showed him where the corner was, and he built the fence according to that line along the north of his farm; that he set out a row of trees inside this fence; that he also set out a row of trees along the east side of the farm and built a barb wire fence along that side about two feet outside the row of trees; that he had recently inspected the present fences, and they appeared to be located where the fences he built were located; that he sold the farm in 1883 or 1884. It further appeared that a Mr. DeVries, who later bought the place and moved on to it in 1891, found the old fences built by Mr. Tyler in a dilapidated condition; that he made some repairs to the north fence, and also ran some barb wire on the row of trees running parallel thereto to make a lane through which to drive cattle; that the outside fence was 7 or 8 feet from the row of trees; that a portion of the fence on the east side was down, and instead of putting in new posts, he tacked the wires onto the trees that stood a foot or two inside the fence line; that the old fence went clear around the place; that the new fence built by Mrs. Mendel appeared to be in the same place as the old fence. Plaintiff's son, Walter Mendel, testified that

he built the new fence on the line of the old, except that he removed the wires nailed to the trees on the east side of the farm and put in posts and replaced the fence about where the old one was originally built. Mrs. Mendel bought the farm in 1910 and moved onto it in the spring of 1911.

Defendant and his two witnesses, former township officers, did not contradict the above testimony, except that they claimed that the old fence on the north line was crooked and that Mendel built the new fence on a straight line, thereby enclosing from one to three feet more of the highway; also that at the corner where the two highways intersected, he had run the corner post about four feet into the traveled part of the highway. As to this latter point, Mendel claimed the corner post was where the old one had been and that the traffic had been gradually encroaching on their property since the corner of the old fence went down.

The defense introduced testimony and elicited admissions tending to show that until recently little attention had been paid in that locality to highway lines; that fences were not constructed with reference to them; that many owners cultivated almost up to the traveled portion of the highways; and that such fences as had been constructed, most of which were old, were erected for the purpose of keeping in stock, etc., and not with any idea of asserting a claim of ownership to the fence line. As to the north fence, Mr. Tyler testified, on cross-examination:

"I designed to give two rods for my share of the highway.

"Q. (by plaintiff's attorney)   As indicated by Mr. Porter, the surveyor?

"A. Yes, sir.

"Q. (by defendant's attorney)   Well, whether Mr. Porter indicated or not, you intended to give two rods for the highway, didn't you?

"*A.* I suppose I would do what other people—I am a law abiding citizen and do what other people do."

And Mr. DeVries, on cross-examination, admitted:

"*Q.* You didn't know, did you, where the lines were?

"*A.* No, sir, we didn't bother with it. No one ever brought any complaints.

"*Q.* And you never knew whether they were on the lines or off the lines?

"*A.* No, sir, we didn't know anything about it.

*       *       *       *

"*Q.* You never made any claim, you or your father, did you—

"*A.* No, sir.

"*Q.* —that you could hold that line as against the public and the highway.

"*A.* Why, no, we didn't know. We kept the fence right there."

Moreover, a former highway commissioner, Mr. Jacob Bosma, testified to the following conversation with Mr. Derk DeVries, the father of the last named witness, and at that time the owner of the farm:

"I know Mr. DeVries. I remember having a conversation with him at one time in regard to this fence on the north side of the place. It was right by the farm. He was fixing up the fence, was building it, and I asked him if he wasn't out in the road. He said he didn't know, but he said, 'I am just fixing it up for a lane to let my cows down. I don't think it will do any harm.' He said, 'It will be tore down, probably, in a year or two.' I told him I didn't know as it would. I was highway commissioner at that time."

As to the fence on the east side, on cross-examination, after going over the condition and location thereof, witness Walter Mendel testified:

"*Q.* And that constituted the fence enclosing the place, did it not, so far as there was one?

"*A.* Why, it was there. We didn't consider it any more than to keep things out, that is, in the line of stock. It was simply there.

"*Q.* You didn't consider it a fence, then?

"*A.* No, sir.

"*Q.* Nor as marking the line?

"*A.* What is that?

"*Q.* There was no other enclosure on that side, was there, when you went there, anywhere along that side, no other fence?

"*A.* Why, yes.

"*Q.* On the east side I am talking about.

"*A.* From the north corner to these here biggest trees there was an old fence, and then continuing past the big trees to the south corner there was also a fence."

And after going into detail as to these fences he continued:

"*Q.* And that fence with those posts is the one you said that if you had continued it north on the line that it was on, it would have crossed the road opposite your northerly line?

"*A.* Yes, almost.

"*Q.* So that you didn't consider that that fence was on the highway line, did you?

"*A.* I didn't consider anything."

And again:

"*Q.* Now, when you built that fence on the east a year or two ago, you didn't put it along where those trees were and where the other wires were?

"*A.* You hardly could.

"*Q.* Well, you didn't, did you?

"*A.* No, sir.

"*Q.* How far out did you put it?

"*A.* I went out just as far to miss the big branches."

And later:

"*Q.* How did you happen to place that north and south fence on the east side of your land just exactly where you did place it?

"*A.* Why, I followed the course that—I didn't want to nail this fence to the trees because it would spoil the trees, and also, because those big branches—every once in a while a tree maybe about four feet from the bottom will have a big branch out, and you nail a five foot

wire to that and it is going to spoil it, isn't it? I just put it out far enough to miss these big branches.

"*Q.* In other words, you put it out in the first convenient place to put it?

"*A.* Yes, sir."

While it appears without question that a part of the highway both on the north and east side of the farm was occupied by the plaintiff and her predecessors in title, nevertheless we are not of the opinion that there was enough evidence to establish title to the parts of the highways in question by adverse possession. By the decisions of this court, when it was clearly established, it has been permitted to obtain such a title to the public highways, but, as was said in *City of Mt. Clemens* v. *Sanitarium Co.,* 127 Mich. 119:

"The propriety of permitting title to be obtained in this way to the public highways is of more than doubtful expediency."

By legislative act (Act No. 46, Pub. Acts 1907; 3 Comp. Laws 1915, § 12311) this was corrected, and it is no longer possible in this State to obtain title by adverse possession against the public. In the case of *Village of Red Jacket* v. *Pinton,* 126 Mich. 197, it was said:

"When one seeks to obtain land against the public by adverse possession of a part of a street, he should make out a clear case, and the possession should be of such a character, and under such circumstances, as to warrant the conclusion that the municipal authorities must be held chargeable with notice of the adverse possession and with acquiescence therein."

So that, in order that the occupancy of the premises in question ripen into title by adverse possession, it was necessary that all the elements must be clearly established, that is, the possession must be actual, continuous, visible, notorious, distinct and hostile to that

200—Mich.—37.

of the public. The testimony of Mr. Tyler discloses that, at the time he built the original fences, it was his intention to give to the public the two rods as his share of the highway, and it is simply his claim that he thought he placed the fence upon the proper line bounding the highway, and no claim seems to have been made by him nor by his successors in title that they desired to have any property belonging to the highway nor that they occupied any part of the highway with any intention of holding it in a manner hostile to the public right. The distinction between obtaining title by adverse possession as against an individual and gaining title to a portion of a city street as against a municipality was clearly pointed out in the opinion of this court in *Crosby* v. *City of Greenville*, 183 Mich. 452. We think that the plaintiff and her predecessors only had a permissive occupancy of the highway occupied by them, which ceased when the public through its proper officers demanded the use of the entire highway. See *Weber* v. *City of Detroit*, 159 Mich. 14; *Pastorino* v. *City of Detroit*, 182 Mich. 5; *Conner* v. *Railroad Co.*, 183 Mich. 241; *City of Ann Arbor* v. *Real Estate Co.*, 189 Mich. 165.

We are of the opinion that the lower court erred in granting the relief prayed for, and are of the opinion that the plaintiff has failed in sustaining her claim, and that her bill of complaint should be and is hereby dismissed, with costs to the appellant.

OSTRANDER, C. J., and BIRD, MOORE, STEERE, BROOKE, FELLOWS, and STONE, JJ., concurred.