Barney, J.,
delivered the opinion of the court:
The above suits have been consolidated by stipulation, and for the purposes of this decision will be treated as one case. In fact, we see no reason why they were not originally brought as one case.
These suits are to recover compensation for property alleged to have been taken by the United States in the exercise of its power of eminent domain and for which no compensation has been made pursuant to the fifth amendment of the Constitution.
The original petition in this suit was demurred to by defendants, and this demurrer was sustained by the court. {Peabody v. United States, 43 C. Cls. R., 19.) Pursuant to leave granted the petition was amended, evidence was submitted, and the whole case is now before the court for its decision upon the merits.
The case made by the claimants, as appears from the findings, is as follows: In the month of May, 1873, the Government purchased a tract of land containing about 70 acres on what is known as Garrish Island, which is located at the extreme southwest extremity of the State of Maine, at the *53 mouth of the Piscataqua River, and is only separated from the mainland at high water by a narrow inlet. In the fol-. lowing year it began the erection of a battery on this reservation and continued operations to that end until about the year 1876, up to which time about $50,000 had been expended in the work. It does not appear that up to the latter date any guns had been installed in the battery, and the work seems to have been abandoned or neglected until 1898, when an allotment was made for the completion of this battery, and in pursuance thereto a battery consisting of three 10-inch guns was constructed on the old site. This battery was completed about June 30, 1901, and named “ Fort Foster,” and is a part of the defenses of Portsmouth Harbor, which begins at the mouth of the Piscataqua River.
In 1883 the claimant Jennison became the owner of about 200 acres of land on Garrish Island, situated south and west of the Government reservation and fronting about 1 mile on the Atlantic Ocean. This land is peculiarly adapted for use as a summer resort on account of its shore front, bathing beaches, timber, springs, etc., and is otherwise of little value. The next year Mr. Jennison began the erection of a summer hotel thereon called the Pocahontas, which has been added to from time to time since, till at the time of the alleged taking it contained 90 guest rooms and had cost about $50,000. In the meantime he also built and furnished several cottages on this land to rent during the summer season, at a cost of about $16,000. This hotel and the cottages had been yielding Mr. Jennison considerable profit for several years prior to the alleged taking of the land by the Government. The hotel and cottages were built and in operation for some years before the reconstruction of Fort Foster, as stated, and the fort is located within 200 feet of the northwest corner of the claimant’s land and within 1,000 feet of the hotel.
In the month of June, 1902, the soldiers stationed at Fort Foster fired two of the guns there installed, for the purpose of testing the same, over and across the premises of Mr. Jennison at a target located several miles off the shore, and fired the other gun in the same manner in the month of September following. The effect of this firing, by way of concussion, was to do considerable damage to the hotel and cot *54 tages by disturbing the foundation of the hotel, breaking glass, etc. None of these guns have since been fired, but they are kept in constant condition by a detail from a neighboring fort.
It appears from the findings that the erection of this fort and the installation therein of said guns in the manner stated has materially impaired the value of claimants’ land by standing as a constant menace to its quietude as a summer resort and thereby keeping from it probable guests and purchasers. The question, then, before us is, Whether such impairment of value brought about in the manner stated is a “ taking ” of the property of the claimants within the fifth amendment of the Constitution?
In an attempt to make the averment in the amended petition in this suit set forth a taking of claimants’ property within the meaning of the law, the substantial statement in that regard is that it was and is the intention and plan of the Government to fire the guns of Fort Foster over and across the premises of the claimants for practice and other purposes, and that none of said guns can be so fired for any effective purpose without the projectiles from the same passing over the claimants’ intervening land, and evidence has been furnished to sustain this averment.
The findings show (and there appears to be no dispute upon this subject) that if the dividing line between claimants’ land and the Government reservation between high and low water mark is a continuation in the same direction of the undisputed dividing line between said premises above high-water mark, the guns of this fort can not be fired toward the sea without the projectiles therefrom passing over and across claimants’ land. On the other hand, however, the findings show that if the undisputed boundary line between. the claimants’ and the Government’s land terminates at high-water mark, and the boundary line between them from said point to low water is the line bisecting the angle formed by two lines drawn from said point to low-water mark, .one at a right angle to a base line drawn between the two extreme points where the' claimants’ land touches the shore line at high water, the other at a right angle to a base line drawn between the two extreme points where the Government’s *55 land touches the shore at high water, the guns of said Fort Foster may be fired for practice and for all other necessary purposes in time of peace without the projectiles passing over and across claimants’ land.
Hence the settlement of the location of this boundary line may be considered as decisive of this case. The law of the State of Maine as to boundary lines of contiguous proprietors between high and low water mark of course must be looked to in order to settle this question. (St. Anthony Falls Water Power Co. v. Water Commission, 168 U. S., 358, 389.)
The Colonial Ordinance of 1641 provides that the coast line of all lands in the State of Maine shall be the line of low-water mark, and while the ordinance makes no express provision for it, the courts of Maine appear to have decided that under this ordinance the flats lying between high and low water mark must be equitably divided between adjacent owners. It will readily be seen without illustration that such equitable divisions in many cases would not be effected by an extension over the flats of the lines bounding the uplands, as some of them might be so oblique as to almost entirely deprive some of the riparian proprietors of any part of the ocean beach. This question came before the courts of Maine many years ago, and the following rule as to such subdivision was adopted:
To divide flats between adjoining riparian proprietors, draw a base line from one corner, at high-water mark, of each lot to the other, and run a line from each end of this line at right angles to low-water mark. If, by reason of the' curvature of the shore, the lines diverge or conflict with each other, the gain or loss is to be divided equally between adjoining lot owners by bisecting the angles made by the diverging or conflicting lines. (3 Farnham on Waters, 2483;) Emmerson v. Taylor, 9 Maine, 42; Call v. Carroll, 40 Maine, 31; Dillingham v. Roberts, 77 Maine, 284.
The following map ivill show the application of this rule to this-case:
The red line A-B represents the base line drawn from where claimants’ and Government’s land terminates at high-water mark to the point where claimants’ next dividing line terminates at high water. The red line A-C represents the *56 base line of the same character relating to the Government reservation. The blue lines A-D and A-E are drawn at . right angles from said base lines and form the angle which bisected by the dotted line A-F gives the boundary line of the Government reservation and claimants’ land between high and low water mark. » If said boundary line were a continuation in the same direction of the dividing line between said premises, the same is substantially indicated by the blue line A-E, angling, however, a little too far to the south.
It will thus be seen that under this rule the Government is the proprietor of that part of the flats situated to the west of line A-F, which the findings show is sufficient territory over and across which to fire the guns at Fort Foster for practice or any other purpose in time of peace. Such being the case, it can hardly be contended that the firing of these guns, each of them once, in another direction so1 as to send the projectiles over the claimants’ land constitutes a “ taking ” of their property. We can only judge of what property, if any, the Government has desiged to have taken by that over which it has asserted some dominion, or from the possession or enjoyment of which it has actually deprived the owner. If the single discharge of its guns over the lands of the claimants caused them any damage, as it doubtless did, it was a loss over which, as against the Government, this court and no court has any jurisdiction.
The presence of Fort Foster and the probability and perhaps certainty that at times the guns there installed will be fired in time of peace for practice, and that such firing by concussion will injure the property of the plaintiffs, as well as disturb the quietude of summer resorters in its locality, is but consequential damage for which the Government is not liable.
Hence the petition is dismissed.

*0