BarNey, Judge,
reviewing the facts found to be established, delivered the opinion of the court.
A suit nearly identical with this except as to parties and involving the same questions of law to be decided, was before this court before and the petition dismissed (Peabody v. United States, 46 C. Cls. 39), and subsequently appealed by the plaintiff to the Supreme Court, wherein the judgment of this court was affirmed, 231 U. S. 530.
Of course the judgment in that case settles all of the questions of law applicable to the facts as therein found, and it is only necessary to discuss and decide as to facts as found in this case other and different from those found in the Peabody case.
The facts involved in the Peabody case are stated by this court in its opinion as follows:
“ In the month of May, 1873, the Government purchased a tract of land containing about 70 acres on what is known as Gerrish Island, which is located at the extreme southwest extremity of the State of Maine, at the mouth of the Piscataqua Biver, and is only separated from the mainland at high water by a narrow inlet. In the following year it begah the erection of a battery on this reservation and continued operations to that end until about the year 1876, up to which time about $50,000 had been expended in the work. It does not appear that up to the latter date any guns had been installed in the battery, and the work seems to have been abandoned or neglected until 1898, when an allotment was made for the completion of this battery, and in pursuance thereto a battery consisting of three 10-inch guns was constructed ■on the old site. This battery was'completed about June 30, 1901, and named 4 Fort Foster,’ and is a part of the defenses of Portsmouth Harbor, which begins at the mouth of the Piscataqua Biver.
“ In 1883 the claimant Jennison became the owner of about 200 acres of land on Garrish Island, situated south and west of the Government reservation and fronting about 1 mile on the Atlantic Ocean. This land is peculiarly adapted for use as a summer resort on account of its shore front, bathing beaches, timber, springs, etc., and is otherwise of little value. The next year Mr. Jennison began the erection of a summer hotel thereon called the Pocahontas, which has been added to from time to time since, till at the time of the alleged *213 taking it contained 90 guest rooms and had cost about $50,000. In the meantime he also built and furnished several cottages on this land to rent during the summer season, at a cost of about $16,000. This hotel and the cottages had been yielding Mr. Jennison considerable profit for several years prior to the alleged taking of the land by the Government. The hotel and cottages were built and in operation for some years before the reconstruction of Fort Foster, as stated, and the fort is located within 200 feet of the northwest corner of the claimant’s land and within 1,000 feet of the hotel.
“ In the month of June, 1902, the soldiers stationed at Fort Foster fired two of the guns there installed, for the purpose of testing the same, over and across the premises of Mr. Jen-nison at a target located several miles off the shore, and fired the other gun in the same manner in the month of September following. The effect of this firing, by way of concussion, was to do considerable damage to the hotel and cottages by disturbing the foundation of the hotel, breaking glass, etc. None of these guns have since been fired, but they are kept in constant condition by a detail from a neighboring fort.
“ It appears from the findings that the erection of this fort and the installation therein of said guns in the manner stated has materially impaired the value of claimant’s land by standing as a constant menace to its quietude as a summer resort and thereby keeping from it probable guests and purchasers. The question, then, before us is: Whether such impairment of value brought about in the manner stated is a ‘ taking ’ of the property of the claimants within the Fifth Amendment of the Constitution?
“In an attempt to make the averment in the amended petition in this suit set forth a taking of claimants’ property within the meaning of the law, the substantial statement in that regard is that it was and is the intention and plan of the Government to fire the guns of Fort Foster over and across the premises of the claimants for practice and other purposes, and that none of said guns can be so fired for any effective purpose without the projectiles from the same passing over the claimants’ intervening land, and evidence has been furnished to sustain this averment.
“The findings show (and there appears to be no dispute upon this subject) that if the dividing line between claimants’ land and the Government reservation between high and low water mark is a continuation in the same direction of the undisputed dividing line between said premises above high-water mark, the guns of this fort can not be fired toward the sea without the projectiles therefrom passing over and across claimants’ land. On the other hand, however, the findings show that if the undisputed boundary line *214 between the claimants’ and the Government’s land terminates at high-water mark, and the boundary line between them from said point to low water is the line bisecting the angle formed by two lines drawn from said point to low-water mark, one at a right angle to a base line drawn between the two extreme points where the claimants’ land touches the shore line at high water, the other at a right angle to a base line drawn between the two extreme points where the Government’s land touches the shore at high water, the guns of said Fort Foster may be fired for practice and for all other necessary purposes in time of peace without the projectiles passing over and across claimants’ land.”
Thereinafter follows a discussion of the law applicable to the question of boundaries and wherein it was decided that under the decisions of the court of Maine, which were decisive of this question, the latter method of determining the boundary line must be adopted. The width of this part of said flats so belonging to the Government was not found, but it was found that it was extensive enough so that “ the guns from Fort Foster may be fired for practice and for all other necessary purposes in time of peace without the projectiles from the same passing over or across the plaintiffs’ land.”
The above decision of this court in the former case does not appear to be questioned by the plaintiffs, and if it were it would be reaffirmed in the instant case.
The facts as found in this case do not in our opinion vary in substance from those found in the Peabody case, but such variances, as they may appear, will be noted and discussed in this opinion.
(1) The findings show that the grantors of the plaintiffs built and maintained a fence between high and low water mark extending the southerly line between the Fort Foster Reservation and the plaintiffs’ lands on Gerrish Island, and that this fence was maintained from 1876 to 1902. The location of this fence is indicated by the line A-I on the map herewith.[1] If this fence should now be regarded as the line between the plaintiffs’ lands and the Fort Foster Reservation, no guns from such fort could be fired therefrom in any *215 direction except to the westward without the missiles therefrom passing over the plaintiffs’ lands. In short, this boundary line would cut the Government off from any of the tidewater lines in question except to the westward of the reservation.
It thus becomes important to decide whether the building and maintaining of this fence will change the rule as to the proprietorship in tidewater lands by riparian owners as laid down in the former case, this rule having been determined from the decision of the courts of the State of Maine, where this land is located.
Where it is impossible to determine the boundaries of a parcel of land from the call in the deed, stones, monuments, fences, and other evidences of a boundary established and agreed upon by the parties to the conveyance are evidence of such boundary. Hoffman v. Port Huron, 102 Mich., 417; Knowles v. Toothacher, 58 Maine, 172. But when such boundary can be determined from the call in the deed a boundary fence agreed upon by the adjoining parties as the true line, but which varies from the true line, fixes such new boundary only after adverse possession for the statutory period. Horlamus v. Hacker, 69 Wis., 280; Bader v. Zeise, 44 Wis., 96; Phelps v. Henry, 15 Ark., 297.
The boundary of the Fort Foster Reservation which determines where its easterly boundary line reaches low-water mark under the rule as laid down by the courts of Maine and adopted by this court in Peabody v. United States, 46 C. Cls. 39, is obtained from the deed to the United States of the lands intended to be included in the reservation. As there is no such thing as obtaining title from the United States by adverse possession, such boundary must prevail, notwithstanding any fence erected by the plaintiffs or their grantors indicating any other boundary line. Jourdan v. Barrett, 4 How. 67; Frisby v. Whitney, 9 Wall. 187.
It follows from the foregoing that the proprietorship in the tidewater lands to the south of Fort Foster as determined in the Peabody case remains unchanged by the new evidence and that the Government is the proprietor of sufficient territory over and across which to fire its guns at Fort Foster to the southward.
*216 (2) The findings show that the Government fired guns from Fort Foster as follows: November 23, 1914, No. 1 gun, one shot; No. 2 gun, two shots; August 26, 1915, No. 3 gun, two shots; November 19, 1915, No. 2 gun, one shot. Before these shots were fired the officer in charge placed a flag where he believed the line to be between the Government’s and the plaintiffs’ lands and directed the gunners to fire to the westward of such flag so that the missiles would all pass over the Government lands, but it appears that by mistake this flag was placed too far to the east so that at least one of such shots passed a few feet over the tidewater lands of the plaintiffs. Before firing these guns the officer also sent messengers to the hotel and other residences on Gerrish Island to warn the people there that these guns were to be fired, but the hotel having been unoccupied for years, of course they found no one there. The findings do not show that these shots did any injury to the residences on the island or caused any inconvenience to any people thereon. These were the only times any firing was done at this fort since 1902, and were all fired for testing purposes.
(3) The findings also show that Fort Foster is not maintained for practice or target shooting and the guns there arc only fired for testing them and very seldom for that purpose.
The findings show several mortgages existed on a large part of the premises in question, one of which appears to have been foreclosed and the mortgagee now in possession, and if eventually the plaintiffs should recover in this suit the question of the different interests in the lands alleged to have been taken by the United States will have to be considered, but the present disposition of this case makes such action unnecessary.
The fundamental question before the court to be decided in this case is whether the facts as found show a taking by the United States of any of the property of the plaintiffs. That question is to be decided in the light of the opinion rendered by the Supreme Court in the Peabody case, supra, only excepting as the rule therein announced may be rendered inapplicable by the new facts found in this case.
In that case, by Mr. Justice Hughes, the court, after reciting the facts, said, page 538:
*217 “ The question is whether upon this showing the petitioners were entitled to recover.
“ It may be assumed that if the Government had installed its battery, not simply as a means of defense in war, but with the purpose and effect of subordinating the strip of land between the battery and the sea to the right and privilege of the Government to fire projectiles directly across it for the purpose of practice or otherwise, whenever it saw fit, in time of peace, with the result of depriving the owner of its profitable use, the imposition of such a servitude would constitute an appropriation of property for which compensation should be made. The subjection of the land to the burden of governmental use in this manner might well be considered to be a ‘ taking ’ within the principle of the decisions (Pumpelly v. Green Bay Co., 13 Wall. 166, 177, 178; United States v. Lynah, 188 U. S. 445, 469; United States v. Welch, 217 U. S. 333, 339) and not merely a consequential damage incident to a public undertaking which must be borne without any right to compensation (Transportation Co. v. Chicago, 99 U. S. 635, 642; Gibson v. United States, 166 U. S. 269; Scranton v. Wheeler, 179 U. S. 141, 164; Bedford v. United States, 192 U. S. 217, 224; Jackson v. United States, 230 U. S. 1, 23).
“ But, in this view, the question remains whether it satisfactorily appears that the servitude has been imposed; that is, whether enough is shown to establish an intention on the part of the Government to impose it. The suit must rest upon contract, as the Government has not consented to be sued for torts even though committed by its officers in the discharge of their official duties (Gibbons v. United States, 8 Wall. 269, 275; Langford v. United States, 101 U. S. 341, 343; Schillinger v. United States, 155 U. S. 163, 169; Russell v. United States, 182 U. S. 516, 530; Harley v. United States, 198 U. S. 229, 234); and a contract to pay, in the present case, can not be implied unless there has been an actual appropriation of property.” United States v. Great Falls Mfg. Co., 112 U. S. 645, 656, 657.
“ The contention of .the petitioners, therefore, is plainly without merit so far as it rests upon the mere fact that there is a suitable, or the most suitable, field of fire over their property. Land, or an interest in land, cannot be deemed to be taken by the Government, merely because it is suitable to be used in connection with an adjoining tract which the Government has acquired, or because of a depreciation in its value due to the apprehension of such use. The mere location of a battery certainly is not an appropriation of the property within the range of its guns.
*218 “ The petitioners’ argument assumes that the guns, for proper practice, must be fired over the land in suit, and, hence, that this burden upon it was a necessary incident to the maintenance of the fort. The fact of the necessity of practice firing is said to be established by the finding with respect to the line of fire over the Government’s portion of the shore in which it is said that this would be sufficient ‘ for purposes of practice and for all other necessary purposes in time of peace.’ But, in the light of other findings, this is far from affording a sufficient foundation for the conclusion upon which the petitioners insist. On the contrary, that no such necessity as is now asserted can be assumed from the mere fact that the fort is maintained is demonstrated by the facts of this case. This suit was tried in the latter part of the year 1910 and it appeared that none of the guns had been fired for over eight years. When the suit was brought in 1905, nearly two years and a half had elapsed since the firing of a shot. The guns have been fired only upon two occasions, or three times in all, and this firing took place in 1902, shortly after the installation of the guns, for the purpose of testing them. It may be that practice in firing the guns would be highly desirable, but it is too much to say upon this record that the fort would be useless without it. Nor are we at liberty to conclude that the Government has taken property, which it denies that it has taken, by assuming a military necessity in the case of this fort which is absolutely contradicted by the facts proved.
“ Deduced to the last analysis, the claim of the petitioners rests upon the fact that the guns were fired upon the two occasions in 1902, as stated, and upon the apprehension that the firing will be repeated. That there is any intention to repeat it does not appear, but rather is negatived. There is no showing that the guns will ever be fired unless in necessary defense in time of war. We deem the facts found to be too slender a basis for a decision that the property of the claimants has been actually appropriated and that the Government has thus impliedly agreed to pay for it.”
The new findings show that the guns at Fort Foster remained entirely unused from June, 1902, to November, 1914, when three shots were fired from the guns therein installed and five shots in 1915, causing, as before stated, no damage to the adjacent property owners, and only two of which were fired over the plaintiffs’ lands, and that was through mistake of the officer in charge of the firing in determining the line between the Government reservation and the plaintiffs’ lands. *219 The land so fired over was a narrow strip in the southwest corner of said lands of the plaintiffs and containing but a few acres, including tide lands. Stated in a nutshell, the Government has installed three large and three small guns on its reservation on Gerrish Island, which reservation is adjoining the plaintiffs’ lands; this battery is not intended for practice purposes but only to be fired occasionally for the purpose of testing the guns; three shots were fired from the guns in 1902, three shots in 1914, two shots in August, 1915, and one shot in November, 1915; that all these shots since 1902 except two were fired over the Government’s own property, and the two not so fired were by mistake fired over an insignificant corner of the plaintiffs’ lands. The first firing above mentioned has been disposed of by this court and the Supreme Court and is only mentioned here to show whether there is an intention of the Government to take any of the plaintiffs’ property. The fact that the officer in charge of these later firings staked out what he supposed to be the line between the Government’s reservation and the plaintiffs’ property negatives any such intention, and the fact that the gun so fired is at present so installed that it can not be otherwise fired proves no such intention, as obviously its installation can be changed.
Ordinarily one is presumed to intend the natural and inevitable results of his own conduct, but, of course, this intention may be negatived by proper evidence. It is hardly necessary to say that the question of the intention on the part of the Government is vital in this case. Do the facts as found show an intention on the part of the Government to impose a servitude upon any part of the plaintiffs’ premises ? Three shots were fired in 1902 for testing purposes and the missiles passed over an insignificant part of the plaintiffs’ premises; several shots were fired again twelve years thereafter for the same purpose, two of which passed over the same negligible part, and this encroachment occurred by mistake of the officer in charge of the firing as to the boundary line; there was ample room to fire all of these guns over and across Government territory. In our opinion these facts of themselves do not show any intention on the part of *220 the Government to impose any such, servitude upon the plaintiffs’ land. To reinforce this opinion we have the further fact that Fort Foster was not built for the purpose of firing any of its guns over the plaintiffs’ lands in time of peace or for so firing them except on its own premises occasionally for testing purposes. If these facts show any taking at all by shooting over plaintiffs’ lands it is at most only a fraction of an acre in the southwest part of the plaintiffs’ premises and we do not think they show even that fact.
This, in our opinion, eliminates from this case the question of the taking of the lands of the plaintiffs by shooting over them and reduces it to the question as to whether the noise, vibration, concussion, or whatever it may be called, occasioned by the firing of these guns, constitutes a taking of the lands of the plaintiffs under the Fifth Amendment. The concussion arising from the occasional firing of these guns (once in 10 years or more) may be unpleasant for some people living near at hand, and when not prepared for it may do slight damage to the contents of near-by buildings, but this is not a taking of all the premises so occasionally rendered unpleasant to their inhabitants. It is but the tribute that all must pay for living near necessary Government works of this kind. At most it is but a nuisance for which the Government is not liable in this or any other court.
It has been held that railroads are a public necessity, and when properly conducted no actionable damage accrues to adjacent proprietors from the noise, vibration, smoke, etc., thereby produced. 1 Lewis on Eminent Domain, sec. 235; Carroll v. Wis. Cen. Ry., 48 Minn. 601; Decker v. Evansville Ry., 133 Ind. 49; Beseman v. Penn. R. R. Co., 50 N. J. L. 235; Richards v. Washington Terminal Co., 233 U. S. 546. In the latter case Pitney, J., speaking of the liability of railroads in their management, said:
“Any dimunition of the value of property not directly invaded nor peculiarly affected, but sharing in the common burden of incidental damages arising from the legalized nuisance, is held not to be a ‘taking’ within the constitutional provision. The immunity is limited to such damages as naturally and unavoidably result from the proper conduct of the road and are shared generally by property owners whose lands lie within range of the inconveniences neces *221 sarily incident to proximity to a railroad. It includes the noises and vibrations incident to the running of trains, the necessary emission of smoke and sparks from the locomotives, and similar annoyances inseparable from the normal and nonnegligent operation of a railroad. Transportation Co. v. Chicago, 99 U. S. 635, 641; Beseman v. Pennsylvania R. R. Co. 50 N. J. L. 235, 240; affirmed 52 N. J. L. 221. * * *
“The immunity from liability for incidental injuries is attended with a considerable degree of hardship to the private land owner, and has not been adopted without some judicial protest. But, as pointed out by Chief Justice Beasley in the Beseman case, 50 N. J. Law at p. 238, if railroad companies were liable to suit for such damages upon the theory that with respect to them the company is a tortfeasor, the practical result would be to bring the operation of railroads to a standstill. And, on the whole, the doctrine has become so well established that it amounts to a rule of property, and should be modified, if at all, only by the law-making power.” (Id., 554, 555.)
How much more is it a public necessity that the Government should construct seacoast fortifications and occasionally fire guns therefrom without having to pay for all of the lands within the reach of the report of the guns therein installed. In this connection it may be well to call attention to the fact that in this case the facts show that in many places where these fortifications are situated summer resorts are located which are doing a successful business; also to the fact that the Government is exercising proper care to cause as little damage as possible to the people living near these Government works. It is provided in the Government Coast Artillery. Instructions as follows:
“All Coast Artillery troops will have service practice whenever possible at their home stations,” and “ whenever it would be dangerous to shipping or to persons on adjacent shores to have practice at home stations * * * arrangements will be made by district commanders to have the practice at other forts.”
The blast or gases from the guns when fired, as shown in the findings, passing over a few acres in the southwest corner of the plaintiffs’ lands certainly can not be said to constitute a taking, and any discussion of that subject is hardly necessary. It certainly can not be maintained that such *222 blasts constitute a taking of the whole or any appreciable part of Gerrish Island.
It follows from the foregoing that the petition herein should be, and the same is hereby, dismissed, and judgment entered against the plaintiffs in favor of the United States for the cost of printing the record in this cause in the sum of $560.91.
Hay, Judge; Downey, Judge; Booth, Judge, and Campbell, Chief Justice, concur.

 The map referred to wül be found in 46 C. Cls., facing p. 56.